# ARMIN DEXHEIMER v. E. J. BRATRUDE.

94 N. W. (2d) 359.

January 9, 1959—No. 37,531.

146

*Emmett F. Tighe,* for appellant.
*Erickson & Zierke,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying defendant's motion: (a) For an order vacating and setting aside the verdict of the jury in favor of the plaintiff; (b) for judgment notwithstanding the verdict; and (c) for a new trial on his counterclaim.

It is undisputed that on or about October 1, 1956, the defendant, owner of a 206-acre farm in Watonwan County, entered into an oral agreement with the plaintiff wherein he leased his farm on a crop-sharing basis. In the fall of that year plaintiff moved some of his machinery and equipment onto the farm and also plowed and disked some of the land in preparation for the 1957 farming season.

Plaintiff brought this action against defendant to recover for plowing and disking about 120 acres of the land involved in the oral lease. Defendant in his answer alleged that as a part of the lease plaintiff represented that he would place livestock on the farm, including 20 head of milk cows, and requested defendant to build a barn and make other improvements on the premises to accommodate the stock. Defendant further alleged that, relying upon the representations of plaintiff and the oral leasing agreement, he purchased a barn, had it moved on the farm, and made other improvements costing in excess of $4,500; that before taking possession of the farm plaintiff entered on it and plowed and disked about 92 acres for his own use; and that in January 1957, without any cause, plaintiff gave defendant notice that he would not perform the lease and thereupon abandoned it. Because of the alleged breach, defendant denied any indebtedness to plaintiff for disking and plowing.

In his counterclaim defendant alleged, among other things, that because of plaintiff's breach of the agreement defendant was unable to lease the place to a farmer interested in having dairy stock on the

premises and because of nonuse the improvements made for the plaintiff pursuant to the leasing agreement were of no value to defendant. He claimed that as a result he was damaged in the sum of $500.

The case was tried and submitted to the jury on the question whether there was a voluntary abandonment of the oral lease by the plaintiff or whether the defendant breached the agreement so as to justify plaintiff's leaving the farm. In its instructions the court told the jury that the basis of the lawsuit was the verbal agreement between the parties; that a renting agreement had been entered into; and that plaintiff claimed that the agreement was breached or set aside by the defendant in failing to provide a suitable house and that for that reason plaintiff gave up the premises and claimed pay for the plowing and disking he had done. On the other hand the court explained that it was the claim of defendant that the agreement was breached or set aside by plaintiff in leaving the place after requiring defendant to provide a barn suitable for his live-stock and that the plaintiff thereby voluntarily abandoned the lease and was not entitled to recover for the plowing and disking.

The defendant took exception to the charge in that the court failed to give a requested instruction that, if the jury should find from all of the evidence (a) that the plaintiff and defendant entered into an oral agreement whereby the defendant leased his farm for a year commencing March 1, 1957; (b) that during the fall of 1956 plaintiff did some plowing on the premises in order to prepare the land for the 1957 crop season; (c) that in January 1957 plaintiff advised the defendant that he would not perform the leasing agreement; and (d) that he thereby voluntarily abandoned the lease, then the jury should find that plaintiff was not entitled to recover for the plowing and disking.

The jury returned a verdict for plaintiff and assessed his damages at $630, the amount asked for in his complaint. No damages were allowed defendant on his counterclaim.

In its memorandum attached to the order from which appeal is taken, the court said in part:

"The jury could, from the evidence, find that the erection of a new home was promised by the defendant and that his failure to do so relieved the plaintiff from his obligation to continue on the farm, and

that defendant had damaged plaintiff by failing to provide a suitable home. The jury could also find no damage to the defendant by reason of his placing new equipment on the place.

\* \* \* \* \*

"\* \* \* The jury evidently found that plaintiff's action in giving up the farm was not such as to constitute abandonment."

■ Defendant raised numerous assignments of error upon appeal. In his argument with reference to assignments of error Nos. 1 to 5, inclusive, defendant claims that the court erred in not granting his motion for a directed verdict at the close of the case because it conclusively appeared as a matter of law that plaintiff had abandoned the farm and lease and therefore under the law he was not entitled to recover for the plowing and disking; further that the court having failed to direct a verdict, it should have granted defendant's motion for judgment notwithstanding the verdict.

Where one party (defendant) moves for a directed verdict there must be admitted, for the purposes of the motion, the credibility of evidence for the adverse party (plaintiff) and every inference which may be fairly drawn from such evidence. 19 Dunnell, Dig. (3 ed.) § 9764, and cases cited.

The evidence is in sharp conflict between the parties as to certain phases of the oral lease, and particularly with reference to what was to have been done about building a house. For example, plaintiff on direct examination testified that about the end of September or early in October 1956 the defendant telephoned him and said he had purchased the farm in question and asked plaintiff to come in and see him about renting the place; that he went to see the defendant the same day and the latter took him out and showed him the farm; that defendant talked about a 50-50 "Livestock and everything" rental arrangement which did not appeal to plaintiff, although he said he "would probably go on half of the corn and two-fifths of the small grain." Although they did not reach an oral agreement at that particular time plaintiff testified, when asked as to what the parties discussed with reference to the building, "Well, he [defendant] said he would put up a new house." After defendant told him that, plaintiff said he agreed to lease the farm

and that part of the agreement was that defendant would build a new house and have it ready by March 1, 1957, when plaintiff's lease expired on another farm.

In connection with his discussion with the defendant about the buildings, plaintiff testified:

"A.  Well, I told him I would never milk in that old barn, I said I just couldn't see any way of living in that old house.

"Q.  And what did he say?

"A.  Well, he said he would put up a new house.

"Q.  After he told you that he would put up a new house did you agree to lease the farm from him?

"A.  I did, yes."

Plaintiff also testified that after making the lease agreement he did some disking and plowing on the farm because the defendant "kept after me, wanted to know when I could start." He said that in November 1956 he plowed about 140 acres, but 20 acres of that plowing was in exchange for grass seed so all that he sued for was plowing and disking 120 acres.

Plaintiff said that after he had done the plowing, and about December 1, 1956, he told the defendant that he did not believe he could rent the farm because "there is just nothing being done out there about that house, and the other tenant is gone and it is just setting there, and there is nothing being done about a new house or anything else, and I just can't see moving my family in that old house." He claims that he reminded defendant "at least a dozen times" about the latter's promise to build a new house. He was asked:

"Q.  But did you definitely tell him at that time that you weren't going to go ahead?

"A.  Yes, I told him that, yes."

Defendant argues, however, that under the oral agreement plaintiff was not to move on the premises until March 1, 1957, as one Christianson, the other tenant, had a written lease until that time; that about December 1, 1956, plaintiff rented another farm and moved what personal property he had on defendant's farm to the other place. He therefore contends that the plaintiff voluntarily abandoned the farm

150

and lease and cites from the latter's testimony on cross-examination as follows:

"Q. You voluntarily gave up this farm yourself, did you not?

"A. Yes.

"Q. Dr. Bratrude didn't ask you to give it up?

"A. No.

"Q. After you had rented the Bolte farm then you decided that you didn't want two farms?

"A. That's right."

Previously, however, on direct examination plaintiff testified:

"Q. To go back for just a minute to the house, was there any other reason for you giving up that lease but the fact that Dr. Bratrude would not build this house?

"A. No, because I had no other place to go then."

On cross-examination plaintiff denied that he had moved all of his personal property off defendant's farm before he told the latter that he was giving up the lease. At one point in his testimony he was of the opinion that he rented the Bolte farm the same day that he notified defendant he was giving up his farm, while at another point he said that he had a verbal agreement with Bolte before he told defendant and that he moved on the Bolte farm December 18, 1956.

It was some time later that plaintiff brought this action against the defendant for the plowing and disking.

The defendant denied that he promised plaintiff that he would build a new house for him if he did move on the farm; he said that there were no such promises made. He did say that he had plans to remodel the other house on the farm but did not know if he told plaintiff about such plans. In any event he testified that he did not have any such house remodeling plans in October 1956, that he did not tell plaintiff in that month that he had such plans; but that he had some plans made in February 1957. He denied plaintiff's claim that he had asked him from time to time about getting the house started. Neither did he agree, in response to a question on the part of plaintiff's counsel, that the present house was very "poorly fit for occupancy." After a definite denial that

plaintiff had kept after him in October and November 1956 to do something about the house, defendant did say plaintiff had mentioned to him that there was a house for sale over at Madelia and asked him to go over and see if he could buy it and move it on to the place. When asked if the plaintiff ever told him that the living conditions in the house on the farm were poor, defendant answered "He never said a word to me."

Defendant explained that he was intending to put up a house when the other tenant gave up possession on March first. He was asked on cross-examination when he arrived at such an intention and he replied in effect that it was none of the questioner's business. When admonished by the court to answer, defendant said that he probably made up his mind in December 1956, but that he did not intend to do anything until after his tenant (Christianson) moved off March 1, 1957.

"Q. Then it is true that you certainly weren't going to build or remodel the house between December 1st, 1956, and March 1, 1957, isn't that correct?

"A. Well, I got the cement blocks out there, and I got lumber out there, and I have pictures to show it."

He explained, however, that he has never built or remodeled the house since that time, though some improvements were made, such as putting in cupboards and fixing windows, which made the house more livable in defendant's opinion than it was in the fall of 1956.

It will serve no useful purpose to go further into detail in connection with the conflicting testimony between the parties. Suffice it to say that we have examined the record carefully to ascertain whether there was evidence from which a jury could find that the erection of a new house was promised by the defendant and that his failure to provide a suitable house relieved plaintiff from his obligation under the oral lease.

Viewing the evidence in the light most favorable to the prevailing party, which we are compelled to do, it is our opinion that there was testimony which would have permitted a jury to find that a new or improved house was promised plaintiff by the defendant and that at the time plaintiff notified defendant that he was not going through with the deal he would have been justified in assuming that the defendant either did not intend to have the house constructed or could not do so before

March 1, 1957. The conflicting testimony between the parties as to agreement with reference to the house and some other matters in dispute were fact questions. The jury from its verdict appears to have determined that there was an agreement between the parties with reference to the house and that under the record here it could not have been constructed before March 1, 1957, and that therefore plaintiff's actions did not constitute a voluntary abandonment of the lease so as to preclude a possibility of recovering for the plowing and disking which work under the circumstances here must have been a benefit to the defendant.[1] It is well settled that findings of fact based on conflicting evidence will not be disturbed on appeal unless manifestly and palpably contrary to the evidence as a whole even though we might have found the facts to be different if we had the factfinding function. First Trust Co. v. McLean, 254 Minn. 75, 93 N. W. (2d) 517.

Defendant argues that the leasing, plowing, surrender, and abandonment of the farm as shown by the evidence brings this case within the rule of Hill v. Groves, 209 Iowa 45, 227 N. W. 582; Boyd v. Gore, 143 Wis. 531, 128 N. W. 68; and Kiplinger v. Green, 61 Mich. 340, 28 N. W. 121. He contends from the above-cited cases that the law is well settled that where a tenant, before he abandons a farm, plows land to advance his own interest in preparation for the next farming season he cannot recover from the landlord for the plowing and disking.

An examination of the above-cited cases satisfies us that there is a distinction between them and the case at bar in that under those cases there was a voluntary surrender by the tenant with no evidence of a breach of terms of the covenant or lease by the landlord. In the instant case there is evidence in connection with the house matter that the defendant landlord did breach a term of the oral lease. Plaintiff also testified that sometime in November 1956 defendant "kept after me"

---

[1]See Annotation, 28 A. L. R. (2d) 456, § 5, and cases cited, to the effect that where a landlord breaches a covenant to make repairs or improvements prior to the commencement of the term and the prospective tenant does not take possession of the premises, most of the later cases treat the covenants as mutual, denying the landlord the right to enforce the lessee's covenant to pay rent and permitting the tenant to sue for damages or rescission of the lease.

and wanted to know when I could "Start disking and plowing." While that evidence was disputed, it still constituted a fact question for the jury.

In Hill v. Groves, *supra*, the tenant refused to proceed with the lease and left the premises because the bank holding a chattel mortgage on his equipment demanded payment. The tenant was unable to farm the land without this equipment. The landlord was not responsible for that situation and did not breach any of the terms of his lease. Under the circumstances there it was held that the tenant voluntarily abandoned and surrendered the premises against the landlord's protests and could not recover for the plowing on the theory that it was done at the instance and request of the landlord. In Boyd v. Gore, *supra*, the landlord objected to the tenant's staying on the place because the latter had gone into debt. There is evidence that the landlord told the tenant he had better leave because he could not carry on the farm; that the tenant replied that it was all right and removed from the place; and that the landlord accepted and resumed possession. The court said that this did not show an eviction by the landlord but only a voluntary surrender and that a tenant on a farm who is required by his lease to do plowing in the fall may not, on his voluntary surrender of the farm, recover for fall plowing. In Kiplinger v. Green, *supra*, the court held that where the tenant voluntarily abandoned the farm and forfeited the contract under his notice he could no longer claim any rights under it.

All of those cases involved a voluntary surrender on the part of the tenant, a situation which cannot be said to have been shown as a matter of law under the record in the instant case. Even though plaintiff on cross-examination did answer "Yes" at one point when asked if he voluntarily gave up the farm, at another point he testified that he had no other place to go and that the only reason he gave up the lease was because defendant would not build the house.

■ In his assignments of error Nos. 6 to 8, inclusive, defendant argues that it is improper for the court to permit plaintiff to go into a lease made by defendant with Floyd Koenig on January 29, 1957, particularly with reference to the provisions whereby the new tenant was to plow back 160 acres upon the termination of his lease. Defendant contends that such testimony was immaterial under the authority of Hill

154

v. Groves, *supra.*

In that respect there was testimony by the defendant that while he did not know just how many acres plaintiff plowed and disked on his farm in the fall of 1956 he thought it was less than 100 acres. He also said he did not know how many acres were under plow on January 29, 1957. He was then asked if he did not enter into a lease on that date with Floyd Koenig. That question was objected to on the part of his counsel whereupon plaintiff's counsel, out of hearing of the jury, informed the court that he would like to make an offer of proof for use as impeachment of defendant by offering into evidence the lease dated January 29, 1957, between defendant and Floyd Koenig involving the premises, stating that it was agreed in that lease that there were 165 acres plowed on the premises at the commencement of the lease and that the lessee agreed that he would plow back 165 acres. Upon the statement of counsel for plaintiff that he wanted to use this purely for impeachment purposes, the court admitted the testimony for that purpose only, over defendant's objection. Defendant then testified in part:

"Q. Doctor, you have stated that on January 29th, 1957, that it was your opinion that there was less than 100 acres plowed back on that farm, is that correct, is that what you have testified to here?

"A. Yes.

"Q. On January 29th, 1957, did you enter into a lease with Floyd Koenig?

"A. Yes.

"Q. And in Section 19 of that lease did it read as follows: 'It is agreed there is 165 acres plowed on said premises at the commencement of this lease.'?

"A. Yes, I think that's right.

"Q. And you signed that lease?

"A. I signed that lease with the understanding that we were going to have it surveyed."

It is our opinion, under the record here, that there was no reversible error on the part of the trial court in connection with the admission of the testimony for impeachment purposes only with reference to the

Koenig lease.

We find no reversible error in connection with defendant's assignments of error Nos. 10 or 11; nor can we conclude, under the record here, that the court erred under defendant's assignment of error No. 12 in denying defendant's motion for a directed verdict at the end of the trial, which motion was apparently based on the assumption that it clearly appeared from all of the evidence that the plaintiff had abandoned the farm and lease and was therefore not entitled to recover for the plowing and disking.

We have also considered defendant's other assignments of error and it is our opinion there is no such prejudicial error in the record which would compel a reversal. Here we have a situation which arises far too often in connection with oral farm leases. When a conflict arises each side has an opposite version as to some of the matters purportedly agreed upon. The court and jury had a chance to observe all the parties involved and listen to their conflicting testimony and arrive at a decision. In the absence of prejudicial error it is our opinion that the decision must stand.

In connection with defendant's counterclaim, it was within the discretion of the trial court to deny a new trial and we cannot say that there was such an abuse of discretion as to warrant a reversal.

Affirmed.